## UNITED STATES v. TARTAR CHEMICAL CO.

(Circuit Court of Appeals, Second Circuit. December 16, 1903.)

1. CUSTOMS DUTIES—RECIPROCAL AGREEMENT WITH FRANCE—ALGERIA.

   Article 1 of the agreement between the United States and France, proclaimed August 22, 1902, which was amendatory of and additional to the reciprocal commercial agreement proclaimed May 30, 1898 (30 Stat. 1774), and provided that the earlier agreement "shall apply also to Algeria," was intended to have a prospective operation only.

2. SAME—CLASSIFICATION—POLITICAL QUESTION.

   In regard to the reciprocal commercial agreement between the United States and France, proclaimed May 30, 1898 (30 Stat. 1774), which provided for reduced rates of duty on merchandise "the product of the soil or industry of France," it was arranged by the governments of the two countries to settle the question whether Algeria was a part of France within the meaning of the agreement by an abandonment of the contention on the part of France that it was so included, together with an acceptance in lieu thereof of an additional agreement extending the provisions of the original agreement to Algeria. Held, that this arrangement is binding on the courts, and that merchandise from Algeria, imported into the United States before such arrangement was made, is not subject to the reduced rates of duty provided on such merchandise when imported from France proper.

Appeal from the Circuit Court of the United States for the Southern District of New York.

This cause comes here upon appeal from the United States Circuit Court (116 Fed. 726) for the Southern District of New York, reversing a decision (G. A. 4640) of the Board of General Appraisers which had affirmed the decision of the collector of the port of New York in classifying for duty certain merchandise the product of Algeria.

D. Frank Lloyd, for appellant.

Howard T. Walden, for appellee.

Before LACOMBE and TOWNSEND, Circuit Judges.

TOWNSEND, Circuit Judge. The merchandise in question consists of crude tartar, concededly of Algerian origin, and exported from that country by way of Marseilles, a port of France, in April,

1899, and assessed for duty at the usual rates under the provisions of the tariff act of July 24, 1897, c. 11, § 1, Schedule A, par. 6, 30 Stat. 151 [U. S. Comp. St. 1901, p. 1627]. The protest of the importers presents the single question whether Algeria is part of France, and therefore, so included within the provisions of the President's proclamation of May 30, 1898, for reciprocity with France, issued under authority of section 3 of the tariff act of July 24, 1897 (30 Stat. 203, c. 11 [U. S. Comp. St. 1901, p. 1690]), that the merchandise in question is to be treated as a product of France, and only chargeable with a duty of 5 per cent. ad valorem. The Board of General Appraisers overruled the protest on the ground that the question was not a judicial, but a political, one, and that, as the executive officers of this government have always held that Algeria was a colony of the French Republic, and not a part of France, the courts are bound by said decision. The court below reversed the board, holding that the status of French territory was to be determined by the law of France as explained by its statesmen and diplomats.

In the disposition of this case it is unnecessary to discuss or pass upon either of these propositions. Section 3 of the tariff act of July 24, 1897, provides as follows:

"That for the purpose of equalizing the trade of the United States with foreign countries, and their colonies, producing and exporting to this country the following articles: argols or crude tartar, * * * the President be, and he is hereby, authorized, as soon as may be after the passage of this act, and from time to time thereafter, to enter into negotiations with the governments of those countries, exporting to the United States the above mentioned articles, or any of them, with a view to the arrangement of commercial agreements in which reciprocal and equivalent concessions may be secured in favor of the products and manufactures of the United States," etc.

The reciprocal commercial agreement, entered into between the United States and France in accordance with the provisions of said section, provided that:

"During the continuance in force of this agreement the following articles of commerce [including crude tartar], the product of the soil or industry of France, shall be admitted into the United States at rates of duty not exceeding the following." etc.; "that the rates of duty heretofore imposed and collected on still wines, the product of France, * * * shall be conditionally suspended," etc.

The President's proclamation, made by virtue of said act and commercial agreement, declared, inter alia, that the imposition and collection of duties heretofore collected upon the following named articles, the product of France, by virtue of said act are hereby suspended, etc., and further provided in the same terms as to certain wines "the product of France." In these circumstances, the French government claimed that Algeria was a part of France, within the meaning of the President's proclamation, and the government of the United States denied this contention. The questions raised in the discussion of said contention were disposed of by the agreement reached in the correspondence between the representatives of the two governments, which was afterwards embodied in a commercial agreement.

127 F.—60

On May 10, 1900, the French ambassador, Jules Cambon, referring to the discussion already had, says as follows:

"Be the case as it may, a disagreement has arisen between us as to the scope of the agreement of May 28, 1898. It is important that this misunderstanding should cease, and, since, in the view of the Treasury Department, the advantages of the agreement of May 28, 1898, should not be purely and simply extended to Algeria, it would be proper, it seems, to provide by a special declaration that the American productions mentioned in that agreement shall enjoy in Algeria the privileged treatment which is granted to them on the continent, and that, by way of reciprocity, the productions mentioned in said agreement and being of Algerian origin shall enjoy in the United States the more favorable treatment that is reserved for our continental productions.

"Such a declaration would put an end to the misunderstanding which has arisen between our two governments, and I must add it would be entirely favorable to American interests."

To this communication, John Hay, Secretary of State, replied, inter alia, as follows:

"Remarking at this time only that the word 'France' was used in the agreement as a well-known geographical and European description, quite distinct from 'Algeria,' an African country, which was suggested for inclusion only after signature of the agreement, I beg to say that the Department does not see any particular objection to an additional agreement for the inclusion of Algeria, as a friendly adjustment, if the pending convention under the fourth section shall be ratified by both Governments. As that Convention expressly includes Algeria, uniformity would then be desirable.

"In view of the foregoing considerations, the Department would suggest that further action be deferred until the ratification of the main convention by the two Governments."

To this letter the French ambassador replied as follows:

"I cannot but felicitate myself that Your Excellency sees no particular objection to an additional agreement which shall extend to Algeria the benefit of our commercial arrangement of May, 1898.

"Your Excellency adds, however, that there would be no occasion to consider this question until after our Commercial Convention of July 24, 1899, shall have been voted by the Congress and by our Parliament and been ratified by our two Governments. Permit me to observe to you in this regard that the act of July 24, 1897, known as the Dingley Act, is careful to clearly distinguish the products comprehended in its 3rd section from those included in section 4, as well as the rights of the administration in either case. Under these conditions, it does not seem that there is any ground for subordinating the additional declaration which I have the honor to ask in favor of Algeria to the ratification of the Convention of July 24, 1899, which the Congress must first approve.

"Permit me to invite your attention to this consideration and to hope that the additional agreement in favor of Algeria will not be subjected to a fresh delay."

Afterwards, in accordance with said suggestions of the French ambassador, an amendatory and additional agreement to said commercial agreement of May 28, 1898, was signed on August 20, 1902, and was proclaimed by the President on August 22, 1902. This agreement recited as follows:

"Whereas the United States and the French Republic have concluded, on August 20, 1902, an Amendatory and Additional Agreement to the Commercial Agreement of May 28, 1898, between the same contracting parties, entered into in accordance with the provisions of Section 3 of the Tariff Act of the

United States approved July 24, 1897, which Amendatory and Additional Agreement is * * * as follows."

The two articles of said agreement are as follows:

"Article 1. The High Contracting Parties mutually agree that the provisions of the said Agreement shall apply also to Algeria and the Island of Porto Rico. It is further agreed on the part of the French Republic that coffee, the product of Porto Rico, shall enjoy until the 23rd day of February, 1903, the benefit of the minimum customs tariff of France on that article.

"Art. 2. This Amendatory and Additional Agreement shall take effect from and after the date of the President's Proclamation which shall give effect thereto, and shall be and continue in force during the continuance in force of the said Commercial Agreement, signed May 28th, 1898."

The language of article 1, taken in connection with the preceding correspondence, shows that this provision was intended to have a prospective operation only, and indicates that neither government considered that the provisions of the original agreement applied or were intended to apply to Algeria. The only agreement made was that hereafter these provisions "shall apply also to Algeria." The prospective character of the agreement is further shown by the provision in article 1 that the product of Porto Rico shall thereafter enjoy certain benefits, and in article 2 that the "amendatory and additional agreement shall take effect from and after the date of the President's Proclamation." In these circumstances, as both governments agreed to settle the original question as to the status of Algeria by an abandonment on the part of France of its claim under the agreement of May 28, 1898, and an acceptance in lieu thereof of an additional agreement between the two countries, which should also extend the benefits of the original agreement to Algeria, this court is, in any event, bound by said agreement. As the merchandise in question was imported prior to the execution of said amendatory agreement and its proclamation, it follows that it is not entitled to receive the benefits thereof.

The judgment of the circuit court is reversed.