INTERNATIONAL MERCANTILE MARINE CO. v. STRANAHAN.

OCEANIC STEAM NAVIGATION CO. v. SAME.

(Circuit Court, S. D. New York. August 24, 1907.)

1. CONSTITUTIONAL LAW—VALIDITY OF STATUTES—JUDICIAL AUTHORITY AND DUTY.

For a court of first instance to declare unconstitutional an act of Congress is an exercise of judicial power which, in cases where no great and immediate financial loss is threatening, is warranted only when the unconstitutionality exists beyond rational doubt.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, § 42.]

2. SAME—DUE PROCESS OF LAW.

Section 9 of the immigration act of March 3, 1903 (32 Stat. 1215, c. 1012 [U. S. Comp. St. Supp. 1905, p. 279]), which makes it unlawful to bring into the United States any alien afflicted with a loathsome or with a dangerous contagious disease, and provides that "if it shall appear to the satisfaction of the Secretary of Commerce and Labor that any alien so brought * * * was afflicted with such disease at the time of foreign embarkation and that the existence of such disease might have been detected by means of a competent medical examination at such time such * * * transportation company * * * shall pay to the collector of customs * * * $100, for each and every violation of the pro-

visions of this section; and no vessel shall be granted clearance papers while any such fine imposed upon it remains unpaid," does not create a crime so as to render it unconstitutional because it does not provide for a jury trial, the "fine" provided for being, in fact, a penalty, and, if suable at all, recoverable in debt, and not through criminal proceedings. Nor are proceedings for its enforcement unconstitutional as depriving a transportation company of its property without due process of law under a practice by which the Secretary makes his determination that the penalty has been incurred ex parte and without notice, and requires its payment before a clearance is granted, or under a modified practice by which the company is given notice to deposit the amount of the penalty as a condition to the granting of a clearance to the vessel, and is given 14 days in which to show cause why the penalty should not be imposed. The section is a necessary sanitary measure, and as such belongs to that class of summary executive proceedings which Congress may lawfully authorize under its power to regulate immigration.

**3.** SAME.

Under its constitutional power to regulate commerce, Congress may lawfully impose conditions upon the granting of clearance to vessels as a means of enforcing immigration regulations.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Commerce, § 72.]

## At Law.

The plaintiffs in these suits are steamship owners in the North Atlantic trade; the International Mercantile Marine Company operating the American and Red Star lines, and the Oceanic Steam Navigation Company the White Star line. Defendant is the collector of customs at this port. The actions are brought to recover, as illegally exacted, various sums of $100 each, paid defendant as a condition of procuring clearance for certain of plaintiffs' ships. Defendant's justification for such exaction is section 9 of the immigration act of March 3, 1903 (32 Stat. 1215, c. 1012 [U. S. Comp. St. Supp. 1905, p. 279]), declaring it "unlawful for any person including any transportation company * * * to bring into the United States any alien afflicted with a loathsome or with a dangerous contagious disease," and further prescribing that "if it shall appear to the satisfaction of the Secretary of Commerce and Labor that any alien so brought * * * was afflicted with such disease at the time of foreign embarkation, and that the existence of such disease might have been detected by means of a competent medical examination at such time, such * * * transportation company * * * shall pay to the collector of customs * * * $100 for each and every violation of the provisions of this section; and no vessel shall be granted clearance papers while any such fine imposed upon it remains unpaid." Plaintiff transportation companies did bring to this country aliens afflicted with the proscribed diseases. It did appear to the satisfaction of the Secretary that the aliens were so afflicted when plaintiffs embarked them, and that their condition might have been detected by competent medical examination. Neither here, nor before any departmental officer, have plaintiffs disputed these facts; it being the essence of their demand that the existence of disease and the absence of proper inspection therefor are alike immaterial, inasmuch as either the statute under which defendant acted, or the procedure under it, or both, are unconstitutional and therefore ineffectual to prevent recovery of moneys exacted by defendant under the obvious compulsion of stopping the voyage of a ship worth millions until a paltry hundred was forthcoming.

The practice under section 9 has not at all times been the same. Before January 25, 1905, the procedure (in New York at all events) was to examine the immigrants and decide whether any were obnoxious to the section, after which a notice was sent the shipowner, informing him, in substance, that he would pay a fine of $100 per diseased immigrant before his ship could clear, and this writing was the first communication of any sort given by the Department to the carrier on the subject. After the date mentioned, written notice was first given the shipowner that diseased aliens had been discovered on a

given ship, and that the Secretary was satisfied that their condition could and should have been ascertained at the time and by the examination mentioned in section 9, wherefore 14 days were given wherein the persons notified might show cause why their ship should not be fined, and in the meantime clearance was granted only on deposit of $100 as security for the payment of each fine that might be ultimately imposed. This change in practice was wrought by circular 58, and some of the money now sued for was exacted before the circular, and some after.

So far as the evidence herein discloses, circular 58 made no difference at all to these plaintiffs. Before the circular date, they unofficially knew, as soon as inspection of immigrants completed, how many fines they would be required to pay for any given ship, getting such information from their own representatives whose business took them regularly to Ellis Island, and after the circular they had the same means of knowledge, plus a notice which told them nothing new, if their Ellis Island men were alert. But whether information of trouble came in one way or another, plaintiffs' course was the same—i. e., to do nothing—so far as denying the Department's allegations was concerned. These are, I believe, the facts shown by the evidence, all objections to which have been overruled, in order that everything on which counsel have based argument may be before the appellate court, and not because I deem all the evidence material or relevant. On the contrary, I do not think that the information gleaned by plaintiffs through their own men, whether before or after circular 58, bound them at all. For legal purposes the first knowledge they had of official purpose or decision, at any time, was the official notice. Further, I consider 14 days an unreasonably short time within which to show cause, if the shipowners were unprepared with any information regarding the physical condition of their passengers on embarkation, which was the state of the case, and which plaintiffs' counsel assume as a reasonable and lawful position on their clients' part. The fact is that the carriers brought in the aliens on the chance that they would not be deported, and they now assert in effect that the "rules of the game" have not been observed in punishing them for taking the chance.

The cases have been tried without a jury. Formal findings will be signed in accordance with this statement and the following opinion.

William G. Choate and Lucius H. Beers, for plaintiffs.

Henry L. Stimson, U. S. Atty., W. T. Denison, and F. Frankfurter, for defendant.

HOUGH, District Judge (after stating the facts as above). To declare unconstitutional, especially in a court of first instance, an act of Congress, is an exercise of judicial power warranted (in cases where no great and immediate financial loss is threatening) only when the unconstitutionality exists beyond a rational doubt. The practice of which the statute under consideration is an instance—i. e., using a refusal of clearance as a means of extorting settlement of governmental claims—is nearly as old as the Union (Rev. St. § 4206 [U. S. Comp. St. 1901, p. 2843]), and has for 20 years past been a part of our immigration system (Act Feb. 23, 1887, c. 220, § 8, 24 Stat. 415 [U. S. Comp. St. 1901, p. 1293]; Act March 3, 1891, c. 551, § 10, 26 Stat. 1086 [U. S. Comp. St. 1901, p. 1299]). I am not advised of any previous attack upon the practice. It is not asserted that the exact form of words contained in section 9 of the act of March 3, 1903 (32 Stat. 1215, c. 1012 [U. S. Comp. St. Supp. 1905, p. 279]), is any older than that statute, but I believe that most of the battery of argument directed against it might with equal force have been used against other acts of Congress for many years back; and that fact alone would strongly incline me to leave the constitutional question for the higher courts, pursuing the

course illustrated by Spreckels Co. v. McClain, 113 Fed. 244, 51 C. C. A. 201.

I do not, however, incline to think the act unconstitutional. For some years I have regarded it as harshly opposed to the spirit of the Constitution, and perhaps capable of use in derogation of earlier treaty rights of citizens of friendly nations, yet entirely within the congressional power of regulating foreign commerce. This predisposition has rendered the more necessary, careful study of the brief of distinguished counsel for plaintiffs, after which I am still unable to assent to their conclusions.

The proposition first advanced, going to the root of the whole matter, is that section 9 creates a crime, viz., the bringing into the country a diseased alien whose condition might in official opinion have been discovered at the port of embarkation, and for that crime provides a sanction, viz., a fine of $100. From this premise flows the conclusion that by constitutional guarantee a jury trial is secured to those alleged to have committed the crime and incurred the fine. The premise asserted rests wholly on the use of the word "fine" in the section considered. A crime is a wrong which the government "punishes in what is called a criminal proceeding, in its own name" (U. S. v. Lee Huen [D. C.] 118 Fed. 455), and, since the punishment meted out is a "fine," and a "fine" can be collected only in a "criminal proceeding," therefore that which the statute calls unlawful must be a crime, because it entails a fine. This is putting on one word more than it can bear. "Fine" and "penalty" are frequently used interchangeably as in Cunard Co. v. Stranahan (C. C.) 134 Fed. 318, and the mere use of the word "fine" is not conclusive as to the nature of the action at law leading up to it. 1 Bish. Crim. Law (7th Ed.) 17, note. The ingredients of a statutory crime are as well the sanction as the prohibition. An act may be malum in se, and yet no crime even at common law. It may be malum prohibitum, but, if the machinery of the criminal law, the method of enforcement called in the Lee Huen Case the "criminal proceeding," be denied, there is no crime. There being no common-law offenses against the United States, a federal statute adding to the list of offenses must at once define it, denounce it, and afford the appropriate remedy. It has been somewhat loosely said that a crime is an offense punishable through indictment, yet clearly it is a vital element of a crime, legally speaking, that its punishment be reachable through indictment or information. It would I think puzzle the astutest attorney to draw and press to conviction an indictment on this section of the act. It would be necessary to accuse a person, yet the "fine" is imposed on a ship, while on conviction the court would be obliged to direct the payment of $100 to the collector, a method of collection hitherto unheard of on the criminal side. Evidently Congress did not intend by this statute to add to the Criminal Code, and it certainly denied to any crime it inadvertently seemed to create the only proper method of enforcement. To construe the act reasonably, therefore, the $100 "fine" must be considered a penalty, and, if suable at all, recoverable in debt. U. S. v. Banister (C. C.) 70 Fed. 44.

Irrespective, however, of the argument just considered, plaintiffs urge that all proceedings under section 9 are void, as depriving them of

their property without due process of law; the exactions prior to circular 58 having been made without notice or opportunity to defend, and those after the circular in accordance with a procedure not warranted by the act itself. The sum of this contention is that, whether the statute be hopelessly vicious or not, no constitutional method of enforcing its provisions has as yet been put in practice. If this be possibly true, the preliminary inquiry is vital—of what right or property have the plaintiffs been deprived? This question their counsel have answered thus:

"The right which the plaintiffs are here asserting is the right of ownership of their own funds. That is a constitutional right, and plaintiffs are here claiming that that constitutional right has been infringed by the taking of their property."

This statement, I am compelled to think, confounds effect and cause —it really begs the question. Truly the plaintiffs paid money under compulsion; but they did so to get clearance, and the real grievance, the causa causans of the train of events, was the refusal of clearance. If that was lawful and constitutional, everything else was right enough, so that the logical questions are: (1) Had Congress a constitutional right to refuse clearance under the circumstances and in the manner set forth in section 9? And (if such right exists) (2) was clearance refused in accordance with the terms of the statute?

As to the second query, it is enough to say that no substantial defect has been pointed out. The procedure before circular 58 was in literal compliance with the statute, which provides for no notice, and that, since the circular, while more merciful in form, is at least no more drastic in effect, than that of earlier date.

The first question requires consideration of the nature of clearance. The word means to satisfy the customs, harbor dues, and the like, and obtain from the governmental authority of the port leave to depart, and in that sense was known to the language before the establishment of our federal government. Oxford Dict. Murray, tit. "clear" and "clearance." In the absence of statute, clearance is but the gracious permission of the sovereign to depart from a port into which, without like permission implied from an "entry," there was no right to come. In the United States this sovereign power is, by the commerce clause of the Constitution, lodged in the federal government, and the privilege of clearance is granted, regulated, or withheld by statute. It may be wholly suspended by embargo, of which domestic vessel owners cannot complain; and, though it afford to foreign owners a casus belli, they are entitled to no judicial relief. It is only if and when the same power that can altogether withhold clearance transforms the favor thereof into a statutory right that vessel owners can complain at law. Hendricks v. Gonzalez, 67 Fed. 351, 14 C. C. A. 659. In the present instance the very statute of which plaintiffs complain gives them the right of clearance on payment of the sum they seek to recover. It was within congressional power to refuse them clearance altogether. I do not think they can complain of getting it at a price. The foregoing considerations, if well founded, dispose of the cases at bar, but another line of argument has been presented, deserving statement.

As was said in Murray v. Hoboken, etc., Co., 18 How. 284, 15 L. Ed. 372:

"There are matters involving public rights which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which Congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper."

That the regulation of immigration is one of these matters, and that congressional action in withdrawing it almost wholly from the judicial domain is constitutional, has been decided in a line of cases too recent and familiar to need citation. Incidental to the regulation of immigrants, and absolutely necessary to efficiency of administration, is regulation of those who make immigrants possible. The importance of such regulation cannot be exaggerated, and in a city which is at once the immigrant's gateway and dumping ground need not be dilated upon. Section 9 of the act of 1903 is in my judgment a sanitary measure, necessary both for healthy immigrants and uninfected Americans, and as such belongs eminently to that class of summary executive proceedings, transfer of which to the judicial branch would "swamp the courts" (Sing Tuck, 194 U. S. 170, 24 Sup. Ct. 621, 48 L. Ed. 917), and "defeat the object sought to be attained" (Sing Lee [D. C.] 54 Fed. 334).

Every consideration leading to the judgments in Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525, and Lawton v. Steele, 152 U. S. 133, 14 Sup. Ct. 499, 38 L. Ed. 385, makes to uphold the present statute. The destruction of inferior tea and unlawful fishnets, by summary process and without hearing, is certainly no less an infraction of private right than is here complained of. Undoubtedly the power is great, and may be unjustly used, but if under this, as under other sections of the immigration law, executive officers act under peril of suit or legal review for abuse of discretion or malicious conduct, those who bring diseased aliens into the country have as large judicial protection as have the aliens they bring—in each instance as much as the nature of the case will (in congressional opinion) permit.

Let judgment for defendant be entered in each case.