HUBBARD et al. v. LOWE, Internal Revenue Collector.

(District Court, S. D. New York. October 15, 1915.)

1. STATUTES ☞6—ENACTMENT—HOUSE OF ORIGIN—"BILL."

A "bill" is a draft of a proposed statute submitted to the Legislature for enactment, though the word is often used loosely as synonymous with act or law, and it is not the statute, or the final product of the legislative will, but a project for a statute, which by amendment may take a very different shape by the time it is ready for promulgation as a law, to which the Constitution refers in the provision requiring all bills for raising revenue to originate in the House of Representatives.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 5; Dec. Dig. ☞6.

For other definitions, see Words and Phrases, First and Second Series, Bill.]

2. EVIDENCE ☞34—JUDICIAL NOTICE—STATUTES.

The courts take judicial notice that the Statutes at Large describe the Cotton Futures Act of August 18, 1914 (38 Stat. 693, c. 255) as "S. 110" (meaning Senate Bill 110).

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 49, 50; Dec. Dig. ☞34.]

3. STATUTES ☞285—ENACTMENT—EVIDENCE.

Where an act, as it lies engrossed in the office of the Secretary of State, bears the legend "S. 110" (meaning Senate Bill 110), and contains a certificate of the secretary of the Senate that it originated in the Senate, affixed pursuant to a practice originally based on a joint rule and continued without interruption after the abrogation of the rule, the court must accept the statement of the records that the act originated in the Senate, and the journals of Congress cannot be resorted to.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 17, 27, 384, 385; Dec. Dig. ☞285.]

4. PLEADING ☞214—ADMISSIONS BY DEMURRER—MATTERS NOT WELL PLEADED.

A demurrer admits nothing not well pleaded, and that which cannot be lawfully proved cannot be well pleaded.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 525–534; Dec. Dig. ☞214.]

5. STATUTES ☞6—ENACTMENT—REVENUE BILLS—HOUSE OF ORIGIN.

The Cotton Futures Act, as originally passed by the Senate, sought to prohibit contracts for cotton futures not in the form therein prescribed, by excluding from the mails all matter relating to the business of those exchanges not using the statutory contract; but the House of Representatives struck out everything after the enacting clause and substituted a different act, seeking to prohibit such contracts by the imposition of a prohibitive tax. Held, that the bill originated in the Senate, within the constitutional provision requiring revenue bills to originate in the House of Representatives, but providing that the Senate may propose or concur with amendments as on other bills; and hence, even though the journals of Congress were resorted to, the result would be the same, as is shown by the certificate of the secretary of the Senate that the bill originated in the Senate, as it is a common practice and in a parliamentary sense is proper and permissible to substitute by amendment anything germane to the matter of a pending bill, and the court cannot

substitute its own opinion for the congressional opinion of congressional procedure and the meaning of amendments.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 5; Dec. Dig. ☞6.]

6. **Statutes** ☞63—**Enactment—Revenue Bills—House of Origin.**

The Cotton Futures Act, having originated in the Senate, contrary to the constitutional requirement that bills for raising revenue shall originate in the House of Representatives, it is not and never was a law.

[Ed. Note.—For other cases, see Statutes, Dec. Dig. ☞63.]

At Law. Action by Samuel T. Hubbard and others against John Z. Lowe, Jr., as Collector of Internal Revenue. On general demurrer to the complaint. Judgment for plaintiffs.

Action at law to recover a tax alleged to have been illegally assessed against and collected from plaintiffs. Heard on general demurrer to the complaint.

The tax in question was imposed under "United States Cotton Futures Act," approved August 18, 1914 (38 Stat. 693, c. 255). The complaint sets forth in the fullest manner the origin and history of this statute, as shown by the journals of the Senate and the House of Representatives, and avers that on May 28, 1915, the plaintiffs, on the New York Cotton Exchange, made a contract for the sale of cotton for future delivery, a copy of which contract is annexed to the complaint, and is not in the form nor does it contain the provisions prescribed and provided for by section 10 of the statute and the regulations promulgated by the Secretary of the Treasury pursuant to the act under date of January 30, 1915. It is further shown that shortly after the execution of this cotton futures contract the Commissioner of Internal Revenue, under the authority of the Cotton Futures Act, assessed a tax upon the said contract. The defendant demanded payment of the tax so assessed and threatened to levy upon plaintiffs' property for the same, whereupon plaintiffs paid the amount of the tax under protest, and after unsuccessful appeal to the Secretary of the Treasury brought this action to recover the $1,000 so paid.

The ground of recovery is "that said United States Cotton Futures Act is not and was not on May 28, 1915, or at any time thereafter, a law of the United States." The reasons assigned for its not being a law are its unconstitutionality, because:

(1) The tax is upon the privilege of dealing on exchanges, and not upon the business itself there transacted, but the tax is laid or not laid, not by the extent of the privilege, but by the manner of use of the privilege—that is to say, a man who makes a contract on the exchange in the form approved by the statute is not taxed. but if the same or another man makes a contract of the same value or transacts the same amount of business on the same exchange, but uses any other form of contract than' that governmentally approved, he is taxed. This classification of or measure for taxation is said to be unconstitutional and to vitiate the entire statute.

(2) The United States Cotton Futures Act is in the language of the Constitution "a bill for raising revenue"; but it did not originate in the House of Representatives, and did originate in the Senate. It is therefore unconstitutional, because the command is imperative that "all bills for raising revenue shall originate in the House of Representatives; but the Senate may propose or concur with amendments as on other bills."

The demurrer admits the history of the bill to be true, and casts upon the court the duty of deciding whether the statute is unconstitutional upon either of the grounds assigned.

Miller & Auchincloss, of New York City (David Hunter Miller, of New York City, of counsel), for plaintiffs.

H. Snowden Marshall, U. S. Atty., and Earl B. Barnes, Asst. U. S. Atty., both of New York City, for defendant.

HOUGH, District Judge (after stating the facts as above). That an unconstitutional statute is not a law at all is a proposition no longer open to discussion. It has not, however, been so often considered that there are varieties of unconstitutionality. This fact is illustrated by the two branches of argument presented in this case.

The common and ever-recurring question arising under those laws regulating laws, which we call Constitutions, is whether a given act seeks to produce a result forbidden by the fundamental law. The much rarer and less important problem is whether the lawmakers have used the constitutional tools in the manner constitutionally prescribed.

The exercise of judicial power in respect of the first question in any of its protean forms is a matter of great seriousness, for it often amounts to a denial of the legislative will on subjects long considered and solemnly determined. The second form of unconstitutionality is far less important, for it is usually no more than a declaration that by carelessness or inadvertence something has been done in such slovenly shape that it must be done over.

For every reason, therefore, it seems best to first consider the objection to this statute based upon the statement that it is a bill for raising revenue originating in the Senate, and if that objection be "good beyond rational doubt" (International Mercantile Marine Co. v. Stranahan [C. C.] 155 Fed. 428), to go no further. I am perhaps saved from inquiry whether the Cotton Futures Act is a "bill for raising revenue" by the agreement of counsel on this point. They have all asserted that, though every one who has studied the investigations, reports, and discussions preceding and producing the passage of the act knows that nothing was further from the intent or desire of the lawmakers than the production of revenue, nevertheless the result of their efforts is a revenue bill within the constitutional meaning.

This familiar paradox results from McCray v. United States, 195 U. S. 27, 59, 24 Sup. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561, and the doctrine that the motive or purpose of Congress in adopting a statute cannot be judicially inquired into. As in the case cited the Legislature desired to suppress the sale of colored oleomargarine, so here it desired to destroy every form of contract for future delivery of cotton, except that marked out by the statute. In both instances the object was sought to be attained by a tax intended to be prohibitive; in both the statutes are by title called tax bills, and to both the same treatment must be accorded, viz.: They are revenue bills, because Congress gives them that label and provides the machinery of levy and collection. It is immaterial what was the intent behind the statute; it is enough that the tax was laid, and the probability or desirability of collecting any taxes is beside the issue.

[1] Assuming that the constitutional phrase applies, inquiry may next be made as to the meaning of the word "bill," in contradistinction from "statute" or "act." "A 'bill' is a draft of a proposed statute submitted to the Legislature for enactment." People v. Reardon, 184 N. Y. 431, 77 N. E. 970, 8 L. R. A. (N. S.) 314, 112 Am. St. Rep. 628, 6 Ann. Cas. 515. This definition has been universally accepted, although the word is "often used loosely as synonymous with act or

law." Sedgwick Co. Com'rs v. Bailey, 13 Kan. 600. It follows that what the Constitution requires to originate in the House of Representatives is not the final product of the legislative will, not the statute, but a project for a statute, which may by amendment take a very different shape by the time it is ready for promulgation as law. Where, therefore, did the Cotton Futures Act originate, when it was in the chrysalis form of a "bill"? Here contest begins, for it should first be settled as to what evidence the court must or may consider to ascertain origin, a technical point somewhat obscured by the form of the pleading.

[2, 3] The complaint shows (1) that the act, as it lies engrossed in the office of the Secretary of State, bears the legend "S. 110" (meaning Senate Bill 110), and also contains the certificate of the secretary of the Senate to the effect that "this act originated in the Senate." The court takes judicial notice that 38 Stat. 693, also describes this statute as "S. 110." It is pleaded and admitted by the demurrer that the certificate of the secretary of the Senate was affixed to the original bill pursuant to the joint rules of both houses of Congress, in existence since 1789. On argument it was discovered that these rules were abrogated in 1876; but the practice of affixing a certificate to each statute adopted, showing its house of origin, has never been departed from. Hinds, Precedents of the House of Representatives, vol. 4, § 3430.

I do not think the abrogation or lapse of the formal "joint rule" is a matter of any importance. The custom is admitted, its importance is obvious, for the President must officially know to which house to return any bill he does not approve. Const. art. 1, § 7, subd. 2. The language of Field v. Clark, 143 U. S. 671, 12 Sup. Ct. 488, 36 L. Ed. 285, et seq., regarding the signature of bills by the presiding officers of the Senate and House is entirely applicable. The "orderly conduct of legislative proceedings" requires some method of authenticating or certifying the house of origin, and it is not for the courts to cavil at the method thereof, practiced without interruption since the establishment of the government.

But the complaint also shows (2) that section 110 was a bill which prescribed a form of contract for cotton futures quite similar to that laid down in the act as passed, and put forward as the sanction of the law proposed, exclusion from the mails of all matter relating to the business of those exchanges not using the statutory contract. The Senate passed this form, but the House struck out everything after the enacting clause and substituted the act as subsequently concurred in by the Senate. In substance the House put forward the same form of contract, it desired the same result, and for the same reasons as did the Senate, but it changed the sanction (so to speak) from a prohibition under penalty by virtue of the postal monopoly to a destructive excise under the taxing power.

All this being shown by the complaint, defendant urges that the bill which originated in the Senate was not a bill for raising revenue; that the taxing element was introduced in the House and there originated; that the certificate of the secretary of the Senate is a mistake, and the existing act did not originate as stated—all of which is evident from the journals of Congress as pleaded by plaintiffs themselves.

[4] But a demurrer admits nothing not well pleaded, and no one can well plead anything he cannot lawfully prove. Therefore this record compels decision as to whether the journals of Congress can lawfully be consulted or offered to contradict the evidence of the enrollment in the secretary's office.

Unless there be some distinction between the signature of bills by the presiding officers of the two houses, and the certification by the recording officer of one house, there is no logical difference between the point in this case and that decided in Field v. Clark, supra. If a court cannot and should not consult the legislative journals to ascertain whether something has been omitted from or smuggled into the bill voted for, if it is bound to accept the certification implied from the signatures of the presiding officers, a fortiori is it bound to accept the merely administrative or parliamentary opinion asserted in the certificate of origin. I hold as matter of law that this court must accept the statement of the records in the office of the Secretary of State that the Cotton Futures Act originated in the Senate.

[5] If, for argument's sake, the journals be consulted, the results that would flow from regarding the same as evidence furnish excellent material for justifying the decision and reasoning in Field v. Clark, supra. By a course of practice so long and widespread as to be matter of common knowledge, it is in a parliamentary sense proper and permissible to substitute "by amendment" anything germane to the matter of a pending bill. Such an amendment as that shown here is common to every Legislature in America at all events. The Senate of the United States, having full power to amend a revenue bill, has from the beginning originated taxes by inserting them in House legislation. The practice and the power is now well settled. If the journals are to be consulted to show that a revenue bill, or so much of any bill as raises or attempts or pretends to raise revenue originated in the House or Senate, according to the interest of the investigator, the interference with the internal economy of Congress would be endless, and productive of endless and useless irritation.

If as matter of fact the relations between the houses in respect of this statute were reversed, and the Representatives had preferred a mail prohibition and the Senate a prohibitive tax, it is, I think, obviously true that, if the certificate showed origin in the House, the same argument made here to show House origin could be made to show Senate origin. Thus the congressional opinion of congressional procedure and the meaning of amendments would be set aside, and judicial opinion substituted therefor. A refusal by the courts to "go behind the returns" as made by the only authorized congressional officers is a piece of good sense which makes for decency and peace. If, however, I were authorized to decide from the journals whether this bill originated in one house or the other, the same result would be reached. I would agree with the certificate on the engrossed act.

Amendments by substitution are a well known method of expediting legislation. In this instance a bill had passed the Senate; if the House had in form rejected that bill, returned it whence it came,

and then sent to the Senate their own bill on the same subject, it would have required nearly as much effort, time, and attention to get to a conference committee as if the Senate had done nothing in the premises. All human organizations find themselves at times enslaved by their own rules, and the device for escape here employed was to put the House project in the Senate "container" and thereby secure for it the advantages inherent under the rules to a bill as far advanced as S. 110 was when it arrived in the House of Representatives. This was legitimate amendment, as that word is used in parliamentary law, and though an amendment may be the most important part of an act, it remains formally only an addition or subtraction; it has no independent parliamentary vitality.

[6] Reverting to the definite finding of law above made, and assuming that the certificate of origin is conclusive, the remaining question is this: When the Congress, through its proper officials, certifies that it has gone through the forms of lawmaking in violation of an express constitutional mandate, is the result a law at all? Of course it is not; the question answers itself, unless there be some different treatment due to an act created in a fundamentally illegal manner and that accorded to one created for an unconstitutional purpose.

There can be no such difference logically. Any and all violations of constitutional requirements vitiate a statute, and it has been so held in three states. Succession of Givanovich, 50 La. Ann., Pt. I, 625, 24 South. 679; Succession of Sala, 50 La. Ann., Pt. II, 1018, 24 South. 674; Perry Co. v. Selma, etc., R. R., 58 Ala. 546; Thierman Co. v. Commonwealth, 123 Ky. 740, 97 S. W. 366. It has not heretofore been found necessary to condemn an act of Congress for this kind of careless journey work, though it has sometimes required a good deal of mental strain to demonstrate that some piece of legislation originating in a Senate was not a "bill for raising revenue." Twin City Bank v. Nebeker, 167 U. S. 196, 17 Sup. Ct. 766, 42 L. Ed. 134; United States v. James, 13 Blatchf. 207, Fed. Cas. No. 15464; Dundee, etc., v. Parrish (C. C.) 24 Fed. 197; Geer v. Board of Commissioners, 97 Fed. 435, 38 C. C. A. 250.[1] If these courts had not assumed that a revenue bill of Senate origin was a nullity, why spend so much time in proving that the act under consideration was not such a bill?

Defendant has urged upon the court that in Rainey v. United States, 232 U. S. at page 317, 34 Sup. Ct. at page 431, 58 L. Ed. 617, the Su-

---

[1] NOTE.—In the following cases arising in states containing the same constitutional limitation, effort has been made to show that a given statute was not a bill for raising revenue: Mumford v. Sewall, 11 Or. 67, 4 Pac. 585, 50 Am. Rep. 462; State v. Wright, 14 Or. 365, 12 Pac. 708; Northern, etc., Trust v. Sears, 30 Or. 388, 41 Pac. 931, 35 L. R. A. 188; Evers v. Hudson, 36 Mont. 135, 92 Pac. 462; Fletcher v. Oliver, 25 Ark. 289; Curryer v. Merrill, 25 Minn. 1, 33 Am. Rep. 450; Harper v. Commissioners, 23 Ga. 566; Colorado, etc., Co. v. Clayton, 54 Colo. 256, 130 Pac. 330; Anderson v. Ritterbusch, 22 Okl. 761, 98 Pac. 1002; Sheppard v. Dowling, 127 Ala. 7, 28 South. 791, 85 Am. St. Rep. 68; Commonwealth v. Bailey, 81 Ky. 395; Day Co. v. State, 68 Tex. 526, 4 S. W. 865. See, also, the Opinions of the Justices in 126 Mass. 557, and 70 N. H. 642, 50 Atl. 329.

preme Court declined to state that there was "judicial power after an act of Congress has been duly promulgated to inquire in which house it originated for the purpose of determining its validity." There was nothing in the Rainey Case requiring decision on the point here raised which is not (under the reasoning in Field v. Clark, supra) an inquiry as to the house of origin of the Cotton Futures Act. No inquiry is necessary. The certificate of Congress, the enrolled act and the statutes at large all proclaim the house in which Congress thought this bill originated, wherefore the sole question here is as to the effect of such a proclamation of unconstitutional action. To this situation the remark in the Rainey Case has no application.

It is not seen how the court can disregard the information furnished by the Congress itself. The Cotton Futures Act is not, and never was, a law of the United States. It is one of those legislative projects which, to be a law, must originate in the lower house. For this reason alone the plaintiffs may take judgment.

It is most unsatisfactory to feel compelled to ground decisions upon so technical a point; but, such as it is, this finding disposes of the case, and I must leave undiscussed the argument equally able and interesting upon the other and permanently important branch of litigation.