**STAR-KIST FOODS, INC.,**

v.

**UNITED STATES (Bruno Scheidt, Inc., Party in Interest).**

**C.D. 2043; Protest No. 258737–K.**

United States Customs Court, First Division.

Nov. 21, 1958.

Lamb & Lerch, New York City (John G. Lerch and David A. Golden, New York City, of counsel), for plaintiff.

George Cochran Doub, Asst. Atty. Gen. (Richard E. FitzGibbon, Washington, D. C., Richard H. Welsh, New York City, Samuel D. Slade, and Herman Marcuse, Trial Attys., Washington, D. C.), for defendant.

No appearance for Bruno Scheidt, Inc., party in interest.

Before OLIVER, MOLLISON, and WILSON, Judges.

WILSON, Judge.

The party in interest in this case, Bruno Scheidt, Inc., on April 5, 1955, imported into the United States certain tuna fish, packed in brine. This merchandise was assessed at 12½ per centum ad valorem by the collector as "Fish, prepared or preserved in any manner, when packed in air-tight containers weighing with their contents not more than fifteen pounds each (except fish packed in oil or in oil and other substances)" under the provisions of paragraph 718(b) of the Tariff Act of 1930, as amended by a trade agreement between the United States and Iceland, T.D. 50956, which became effective November 19, 1943, by Presidential proclamation. The duty against such merchandise under paragraph 718(b), without the trade agreement amendment, is 25 per centum ad valorem.

The plaintiff has heretofore been held by our appellate court to be an American manufacturer of merchandise of "the same class or kind as the imported merchandise, within the meaning of section 516(b) of the Tariff Act of 1930 [19 U.S.C.A. § 1516(b)], and * * * therefore qualified to maintain its protest under that paragraph." Star-Kist Foods, Inc., v. United States (Bruno Scheidt, Inc., Party in Interest), 45 C.C.P.A., Customs, 16, C.A.D. 666.

The plaintiff concedes that the classification and assessment of the merchandise are correct, if the agreement between the United States and Iceland (T.D. 50956)

is valid. However, plaintiff attacks that agreement as "illegal and unauthorized" upon the ground that the Trade Agreements Act of 1934, under which the Icelandic agreement was negotiated, is "unconstitutional, null and void." Counsel for the plaintiff, in their brief, state that "the sole question presented is whether or not section 350(a) of the Tariff Act of 1930 (the so-called Trade Agreements Act of 1934) is constitutional." The Government accepts this statement of the issue, and the case has been submitted solely upon that question.

The pertinent parts of the statutes here involved, except as set forth elsewhere in this opinion, are as follows:

Paragraph 718(b) of the Tariff Act of 1930, as enacted by Congress:

"Fish, prepared or preserved in any manner, when packed in air-tight containers weighing with their contents not more than fifteen pounds each (except fish packed in oil or in oil and other substances): Salmon, 25 per centum ad valorem; other fish, 25 per centum ad valorem."

Paragraph 718(b) of the Tariff Act of 1930, as amended by the trade agreement with Iceland, T.D. 50956:

"Fish, prepared or preserved in any manner, when packed in air-tight containers weighing with their contents not more than fifteen pounds each (except fish packed in oil or in oil and other substances):

"Any of the foregoing (except herring, smoked or kippered or in tomato sauce, packed in immediate containers weighing with their contents more than one pound each, and except salmon and anchovies) ...12½% ad valorem."

Section 350(a), which is an amendment, dated in 1943, to the Reciprocal Trade Agreements Act of June 12, 1934, amending the Tariff Act of 1930, 48 Stat. 943, 19 U.S.C.A. § 1351:

"(a) For the purpose of expanding foreign markets for the products of the United States (as a means of assisting in the present emergency in restoring the American standard of living, in overcoming domestic unemployment and the present economic depression, in increasing the purchasing power of the American public, and in establishing and maintaining a better relationship among various branches of American agriculture, industry, mining, and commerce) by regulating the admission of foreign goods into the United States in accordance with the characteristics and needs of various branches of American production so that foreign markets will be made available to those branches of American production which require and are capable of developing such outlets by affording corresponding market opportunities for foreign products in the United States, the President, whenever he finds as a fact that any existing duties or other import restrictions of the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States and that the purpose above declared will be promoted by the means hereinafter specified, is authorized from time to time—

"(1) To enter into foreign trade agreements with foreign governments or instrumentalities thereof; and

"(2) To proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder. No proclamation shall be made increasing or decreasing by

more than 50 per centum any existing rate of duty or transferring any article between the dutiable and free lists. The proclaimed duties and other import restrictions shall apply to articles the growth, produce, or manufacture of all foreign countries, whether imported directly, or indirectly: *Provided,* That the President may suspend the application to articles the growth, produce, or manufacture of any country because of its discriminatory treatment of American commerce or because of other acts or policies which in his opinion tend to defeat the purposes set forth in this section; and the proclaimed duties and other import restrictions shall be in effect from and after such time as is specified in the proclamation. The President may at any time terminate any such proclamation in whole or in part.

\* \* \* \* \* \*

"Sec. 2 [19 U.S.C.A. § 1352].
\* \* \*

"(b) Every foreign trade agreement concluded pursuant to this Act shall be subject to termination, upon due notice to the foreign government concerned, at the end of not more than three years from the date on which the agreement comes into force, and, if not then terminated, shall be subject to termination thereafter upon not more than six months' notice.

"(c) The authority of the President to enter into foreign trade agreements under section 1 of this Act shall terminate on the expiration of three years from the date of the enactment of this Act."

Provisions of the United States Constitution invoked by plaintiff:

"[Article I, sec. 1]:

"All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

"Article I, sec. 7]:

"1. All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills."

"Article I, sec. 8]:

"Section 8—(Powers of Congress)

"1. The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and General Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;

\* \* \* \* \* \*

"3. To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

"[Article II, sec. 2]:

\* \* \* \* \* \*

"2. He [the President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; \* \* \*.

█ It is conceded by the defendant that this court possesses the power to adjudicate constitutional issues (citing Riccomini v. United States, 9 Cir., 69 F. 2d 480, 483–484; Morgantown Glassware Guild, Inc., v. Humphrey, 98 U.S.App. D.C. 375, 236 F.2d 670, 671–672; writ of certiorari denied 352 U.S. 896, 77 S.Ct. 133, 1 L.Ed.2d 87), but the Government argues as a matter of judicial policy that questions involving the constitutionality of acts of Congress should be left for the determination of the appellate courts, unless the unconstitutionality of the legislation under attack "exists beyond a rational doubt." The adjudicated cases as well as authoritative treatises on the law appear to support this position. Mather v. MacLaughlin, •D.C., 57 F.2d 223, 225; International Mercantile Marine Co. v. Stranahan, C.C., 155 F. 428, 430. The rule of law on this point is stated in 16 C.J.S. Constitutional Law § 93, page 303, as follows:

" * * * The exercise of such power, however, should be carefully limited, and avoided if possible, and, unless it appears clearly beyond a reasonable doubt that the statute is unconstitutional, it is considered the better practice for the court to assume that it is constitutional until the contrary is declared by a court of appellate jurisdiction, especially where the statute is of great importance and far-reaching effect, has been in effect for an appreciable period of time, and has been followed in innumerable cases involving the rights of property. In a proper case, however, the court should not hesitate to determine the constitutionality of a statute, if this be necessary. * * * "

In any event, when a congressional enactment is claimed unconstitutional, "all presumptions are in favor of constitutionality." United States v. Smith, D.C., 62 F.Supp. 594, 596; Young v. City of Ann Arbor, 267 Mich. 241, 255 N.W. 579.

The plaintiff's first contention is that the statute under attack contravenes the provisions of section 8, paragraphs 1 and 3, of Article I of the United States Constitution, in that the trade agreements act under review attempts to delegate to the President of the United States powers vested exclusively in the Congress.

In support of this position, the plaintiff relies upon the cases of A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, and Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446. These two cases arose under the National Industrial Recovery Act. In the Schechter case [295 U.S. 495, 55 S.Ct. 841], the President issued an executive order setting up a "Code of Fair Competition for the•Live Poultry Industry of the Metropolitan Area in and about the City of New York." The petitioners were indicted under a criminal proceeding for violations of that code. They asserted that the code under which they were convicted was of no effect because adopted in accordance with an unconstitutional delegation of power from Congress to the President for the regulation of commerce.

In holding that the delegation of legislative power to the President under which the code in the Schechter case, supra, was promulgated was unconstitutional, the Supreme Court of the United States stated, 295 U.S. at page 529, 55 S.Ct. at page 843:

" * * * We recently had occasion to review the pertinent decisions and the general principles which govern the determination of this question. Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446. The Constitution provides that 'All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.' Art. I, § 1. And the Congress is authorized 'To make all Laws which shall be necessary and proper for carrying into Execution' its general powers. Art. I, § 8, par. 18. The Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested. We have repeatedly recognized the necessity of adapting legislation to complex conditions involving a host of details with which the national Legislature cannot deal directly. We pointed out in the Panama Company case that the Constitution has never been regarded as denying to Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply. But we said that the constant recognition of the necessity and validity of such provisions, and

the wide range of administrative authority which has been developed by means of them, cannot be allowed to obscure the limitations of the authority to delegate, if our constitutional system is to be maintained. * * * "

The Court, in the Schechter Poultry Corp. case, supra, then in effect decided that, in the statute under attack, Congress had delegated to the President legislative power "to exercise an unfettered discretion to make whatever laws he thinks may be needed or advisable for the rehabilitation and expansion of trade or industry." 295 U.S. at page 537, 55 S.Ct. at page 846. Summarizing its position, the Court stated, 295 U.S. at page 541, 55 S.Ct. at page 848:

"To summarize and conclude upon this point: Section 3 of the Recovery Act is without precedent. It supplies no standards for any trade, industry, or activity. It does not undertake to prescribe rules of conduct to be applied to particular states of fact determined by appropriate administrative procedure. Instead of prescribing rules of conduct, it authorizes the making of codes to prescribe them. * * * "

In the Panama Refining Co. case, supra, the constitutional validity of "§ 9 (c) of Title 1 of the National Industrial Recovery Act of June 16, 1933, 48 Stat. 195, 200, 15 U.S.C. Tit. 1, § 709(c)" was called in question. The provisions of that section, as set forth in the opinion of the Court, 293 U.S. at page 406, 55 S.Ct. at page 242, were as follows:

"Sec. 9 * * *

"(c) The President is authorized to prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any State law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a State. Any violation of any order of the President issued under the provisions of this subsection shall be punishable by fine of not to exceed $1,000, or imprisonment for not to exceed six months, or both."

The Court pointed out that section 9 (c) was assailed upon the claim that:

" * * * it is an unconstitutional delegation of legislative power. The section purports to authorize the President to pass a prohibitory law. * * * Accordingly, we look to the statute to see whether the Congress has declared a policy with respect to that subject; whether the Congress has set up a standard for the President's action; whether the Congress has required any finding by the President in the exercise of the authority to enact the prohibition."

After considering the provisions of section 9(c), the Court came to the following conclusion, 293 U.S. at page 417, 55 S.Ct. at page 247:

"This general outline of policy contains nothing as to the circumstances or conditions in which transportation of petroleum or petroleum products should be prohibited— nothing as to the policy of prohibiting or not prohibiting, the transportation of production exceeding what the States allow. * * * "

After analyzing the other sections of the act, the Court, in the Panama Refining Co. case, supra, found that no proper safeguards and standards had been fixed to justify the delegation of the powers involved to the President.

In the Panama Refining Co. case, supra, the Court reviewed and approved certain cases in which the delegation of power to the President had been upheld, including the case of The Brig Aurora, 7 Cranch 382, 3 L.Ed. 378, dealing with a trade act. The Court then considered the case of Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294, which will be discussed more in detail later in this opinion. The decision, in the Panama Refining Co. case, also pointed out the

delegations of power by Congress to selective instrumentalities, such as the old Radio Commission and the Interstate Commerce Commission, had been upheld. However, the Court, 293 U.S. at page 430, 55 S.Ct. at page 253, viewed section 9(c) invalid because:

"If section 9(c) were held valid, it would be idle to pretend that anything would be left of limitations upon the power of the Congress to delegate its lawmaking function. * * * "

We are of the opinion that the reciprocal trade agreements act, which is assailed in this section, is not vulnerable on the grounds upon which the provisions of the National Industrial Recovery Act were held invalid in the Schechter and Panama Refining Co. cases, supra. Although the fundamental principle of reciprocal trade agreements under which certain powers have been delegated by Congress to the President of the United States has been in effect for practically the full period of our national existence, and frequent attacks have been made upon the constitutionality of reciprocal trade acts, no instance has been called to our attention in which any such act has been held unconstitutional by our courts.

In the case of Field v. Clark, supra, certain provisions of the Tariff Act of 1890, 26 Stat. 567 were under attack. That act provided that, 26 Stat. 612, § 3:

"* * * to secure reciprocal trade with countries producing the following articles, and for this purpose, on and after the first day of January eighteen hundred and ninety-two, whenever, and so often as the President shall be satisfied that the Government of any country producing and exporting sugars, molasses, coffee, tea, and hides, raw and uncured, or any of such articles, imposes duties or other exactions upon the agricultural or other products of the United States, which in view of the free introduction of such sugar, molasses, coffee, tea, and hides into the United States he may

deem to be reciprocally unequal and unreasonable, he shall have the power and it shall be his duty to suspend, by proclamation to that effect, the provisions of this Act relating to the free introduction of such sugar, molasses, coffee, tea, and hides, the production of such country, for such time as he shall deem just, and in such case and during such suspension duties shall be levied, collected, and paid upon sugar, molasses, coffee, tea, and hides, the product of or exported from such designated country as follows, * * * :"

Then follows the enumeration of specific types of merchandise. In the Field v. Clark case, supra, the Court, 143 U.S. at page 681, 12 S.Ct. at page 501, stated:

"The plaintiffs in error contend that this section, so far as it authorizes the president to suspend the provisions of the act relating to the free introduction of sugar, molasses, coffee, tea, and hides, is unconstitutional, as delegating to him both legislative and treaty-making powers, and, being an essential part of the system established by congress, the entire act must be declared null and void. On behalf of the United States it is insisted that legislation of this character is sustained by an early decision of this court and by the practice of the government for nearly a century * * * :"

[The decision referred to is The Brig Aurora, 7 Cranch 382, 388, 11 U.S. 382, 388, 3 L.Ed. 378, 380.]

The Court then reviewed The Brig Aurora case, supra, and pointed out, 143 U.S. at page 683, 12 S.Ct. at page 501:

"* * * This certainly is a decision that it was competent for congress to make the revival of an act depend upon the proclamation of the president, showing the ascertainment by him of the fact that the edicts of certain nations had been so revoked or modified that they did not violate the neutral commerce of the United States. The same princi-

ple would apply in the case of the suspension of an act upon a contingency to be ascertained by the president, and made known by his proclamation. [Emphasis by the Court.]

" * * * If we find that congress has frequently, from the organization of the government to the present time, conferred upon the president powers, with reference to trade and commerce, like those conferred by the third section of the act of October 1, 1890, that fact is entitled to great weight in determining the question before us."

After reviewing the principal reciprocal trade legislation enacted by Congress throughout the nation's history, the Court, in the Field v. Clark case, supra, came to this conclusion, 143 U.S. at page 690, 12 S.Ct. at page 504:

"It would seem to be unnecessary to make further reference to acts of congress to show that the authority conferred upon the president by the third section of the act of October 1, 1890, is not an entirely new feature in the legislation of congress, but has the sanction of many precedents in legislation. While some of these precedents are stronger than others, in their application to the case before us, they all show that, in the judgment of the legislative branch of the government, it is often desirable, if not essential for the protection of the interests of our people against the unfriendly or discriminating regulations established by foreign governments, in the interest of their people, to invest the president with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations. If the decision in the case of The Brig Aurora had never been rendered, the practical construction of the constitution, as given by so many acts of congress, and embracing almost the entire period of our national existence, should not be overruled, unless upon a con-

viction that such legislation was clearly incompatible with the supreme law of the land. Stuart v. Laird, 1 Cranch 299, 309, 5 U.S. 299, 309 [2 L.Ed. 115, 118]; Martin v. Hunter's Lessee, 1 Wheat. 304, 351, 14 U.S. 304, 351 [4 L.Ed. 97, 109]; Cooley v. Board of Wardens, 12 How. 299, 315, 53 U.S. 299, 315 [13 L.Ed. 996, 1003]; Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 57, 4 S.Ct. 279 [28 L.Ed. 349, 350]; The Laura, 114 U.S. 411, 416, 5 S.Ct. 881 [29 L.Ed. 147, 148].

The Court upheld the provisions of the Tariff Act of 1890, which were under attack.

In our opinion, the Schechter and Panama Refining Co. cases, supra, are clearly distinguishable from the case at bar.

We agree with counsel for the plaintiff that the case of J. W. Hampton, Jr., & Company v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624, is in point in deciding the issue now before us. In our opinion, however, that case is not susceptible to the construction placed upon it by counsel for the plaintiff. On the other hand, the Hampton case really supports the position that the standards and limitations provided in the Reciprocal Trade Agreements Act of 1934 are adequate to protect it against the applicability of the principles announced in the Schechter and Panama Refining Co. cases, supra. In the Hampton case, section 315(a), Title III, of the Tariff Act of September 21, 1922, was assailed upon the ground that the act provided for an unconstitutional delegation of power to the President. The facts, as stated in the opinion of the Court, were as follows, 276 U.S. at page 400, 48 S.Ct. at page 349:

"J. W. Hampton, Jr., & Co. made an importation into New York of barium dioxide which the collector of customs assessed at the dutiable rate of six cents per pound. This was two cents per pound more than that fixed by statute, paragraph 12, c.

356, 42 Stat. 858, 860. * * * The rate was raised by the collector by virtue of the proclamation of the President, 45 Treas.Dec. 669, T.D. 40216, issued under, and by authority of, section 315 of title 3 of the Tariff Act of September 21, 1922, c. 356, 42 Stat. 858, 941, which is the so-called flexible tariff provision. Protest was made and an appeal was taken under section 514, part 3, title 4, ch. 356, 42 Stat. 969–70. The case came on for hearing before the United States Customs Court, 49 Treas. Dec. 593, T.D. 41478. A majority held the act constitutional. Thereafter the case was appealed to the United States Court of Customs Appeals. * * * Thereafter the judgment of the United States Customs Court, was affirmed. 14 Ct.Cust. App. 350. On a petition to this Court for certiorari, filed May 10, 1927, the writ was granted June 6, 1927. 274 U.S. 735, 47 S.Ct. 769, 71 L.Ed. 1336. The pertinent parts of section 315 of title 3 of the Tariff Act, (ch. 356, 42 Stat. 858, 941 U.S. C., Tit. 19, §§ 154, 156,) are as follows:

" 'Section 315(a). That in order to regulate the foreign commerce of the United States and to put into force and effect the policy of the Congress by this act intended, whenever the President, upon investigation of the differences in costs of production of articles wholly or in part the growth or product of the United States and of like or similar articles wholly or in part the growth or product of competing foreign countries, shall find it thereby shown that the duties fixed in this act do not equalize the said differences in cost of production in the United States and the principal competing country he shall, by such investigation, ascertain said differences and determine and proclaim the changes in classifications or increases or decreases in any rate of duty provided in this act shown by said ascertained differences in such costs of production necessary to equalize the same. Thirty days after the date of such proclamation or proclamations such changes in classification shall take effect * * * *Provided*, That the total increase or decrease of such rates of duty shall not exceed 50 per centum of the rates specified in title 1 of this act, or in any amendatory act. * * *

" '(c). That in ascertaining the differences in costs of production, under the provisions of subdivisions (a) and (b) of this section, the President, in so far as he finds it practicable, shall take into consideration (1) the differences in conditions in production, including wages, costs of material, and other items in costs of production of such or similar articles in the United States and in competing foreign countries; (2) the differences in the wholesale selling prices of domestic and foreign articles in the principal markets of the United States; (3) advantages granted to a foreign producer by a foreign government, or by a person, partnership, corporation, or association in a foreign country; and (4) any other advantages or disadvantages in competition.

" 'Investigations to assist the President in ascertaining differences in costs of production under this section shall be made by the United States Tariff Commission, and no proclamation shall be issued under this section until such investigation shall have been made. The commission shall give reasonable public notice of its hearings and shall give reasonable opportunity to parties interested to be present, to produce evidence, and to be heard. The commission is authorized to adopt such reasonable procedure, rules, and regulations as it may deem necessary.

" 'The President, proceeding as hereinbefore provided for in proclaiming rates of duty, shall, when

he determines that it is shown that the differences in costs of production have changed or no longer exist which led to such proclamation, accordingly as so shown, modify or terminate the same. Nothing in this section shall be construed to authorize a transfer of an article from the dutiable list to the free list or from the free list to the dutiable list, nor a change in form of duty. Whenever it is provided in any paragraph of title 1 of this act, that the duty or duties shall not exceed a specified ad valorem rate upon the articles provided for in such paragraph, no rate determined under the provision of this section upon such articles shall exceed the maximum ad valorem rate so specified.'

"The President issued his proclamation May 19, 1924. * * *"

The Court, in the Hampton case, supra, again pointed out as it did in the case of Field v. Clark, supra, 276 U.S. at page 412, 48 S.Ct. at page 353:

" * * * This Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our government and framers of our Constitution were actively participating in public affairs long acquiesced in, fixes the construction to be given its provisions. Myers v. United States, 272 U.S. 52, 175, 47 S.Ct. 21, 71 L.Ed. 160, and cases cited. The enactment and enforcement of a number of customs revenue laws drawn with a motive of maintaining a system of protection since the revenue law of 1789, are matters of history.

"More than a hundred years later, the titles of the Tariff Acts of 1897 (30 Stat. 151) and 1909 (36 Stat. 11) declared the purpose of those acts, among other things, to be that of encouraging the industries of the United States. The title of the Tariff Act of 1922 (42 Stat. 858) of which section 315 is a part, is 'An act to provide revenue, to regulate commerce with foreign countries, to encourage the industries of the United States, and for other purposes.' Whatever we may think of the wisdom of a protection policy, we can not hold it unconstitutional."

In the Hampton case, supra, 276 U.S. at pages 410–411, 48 S.Ct. at page 352, the Supreme Court, in commenting on the Field v. Clark case, supra, stated with respect to the power given to the President under the provisions of section 3 of the Tariff Act of 1890 relative to the suspension of free duty as to certain imports:

" * * * What the President was required to do was merely in execution of the act of Congress. It was not the making of law. He was the mere agent of the law making department to ascertain and declare the event upon which its expressed will was to take effect." [Italics ours.]

The Court, therefore, upheld the constitutionality of section 315(a), Title III, of the act of 1922. The provisions of that act are in most substantial particulars similar to the act now under attack.

In the case of United States v. Sears, Roebuck & Co., 20 C.C.P.A., Customs, 295, T.D. 46086, our appellate court had occasion to pass upon certain provisions of the Tariff Act of 1930. The court upheld section 336 of the Tariff Act of 1930, 19 U.S.C.A. § 1336, citing the Hampton case, supra, and also held that the President had not exceeded the powers delegated to him by an act of Congress.

Referring now to the provisions of the Reciprocal Trade Agreements Act of 1934, we find the declared policy of the act to be to expand the foreign markets for United States products with the view of overcoming an existing emergency. For that purpose, regulations governing the admission of foreign goods into the United States were deemed necessary, and the President is empowered "whenever he finds as a fact that any existing duties or other import restrictions of

the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States and that the purpose above declared will be promoted by the means hereinafter specified is authorized from time to time —(1) To enter into foreign trade agreements * * * (2) To proclaim such modifications of existing duties and other import restrictions * * * as are required or appropriate to carry out any foreign trade agreement that the President has entered into * * *." It is then prescribed that the President shall not issue any proclamation decreasing by more than 50 per centum "any existing rate of duty or transferring any article between the dutiable and free lists." Section 4 of the trade agreements act provides that:

"Before any foreign trade agreement is concluded with any foreign government or instrumentality thereof under the provisions of this act, reasonable public notice of the intention to negotiate an agreement with such government or instrumentality shall be given in order that any interested person may have an opportunity to present his views to the President, or to such agency as the President may designate, under such rules and regulations as the President may prescribe; and before concluding such agreement the President shall seek information and advice with respect thereto from the United States Tariff Commission, the Departments of State, Agriculture, and Commerce and from such other sources as he may deem appropriate." 19 U.S.C.A. § 1354.

■ We are of opinion that, in view of the long-prescribed reciprocal trade procedures, upheld by the United States Supreme Court, the provisions of the Trade Agreements Act of 1934 set up standards sufficient to protect it against the weaknesses found by the Supreme Court in the National Industrial Recovery Act, and that, under the Hampton and Sears, Roebuck cases, supra, the

standards and safeguards fixed in the Reciprocal Trade Agreements Act of 1934 are sufficient to protect the legislation against the attack herein made upon it. We are, therefore, of the opinion that the said Trade Agreements Act of 1934 is constitutional as measured by the standards set forth in the cases heretofore cited as against the contention of the plaintiff that said act attempts an unconstitutional delegation of power to the President.

■ The plaintiff further contends that the trade agreement act under review (T.D. 50956) violates the treaty clause of the Constitution of the United States (Article II, section 2), because it was not presented to the Senate for its concurrence. If the agreement in question is a treaty of the type requiring ratification by the United States Senate, the contention of the plaintiff must be sustained. However, all international undertakings are not such treaties.

In the case of B. Altman & Co. v. United States, 224 U.S. 583, at page 601, 32 S.Ct. 593, at page 597, 56 L.Ed. 894, the Supreme Court did not pass directly on the question as to whether a trade agreement negotiated under the Tariff Act of 1897 was constitutional, but it did say:

" * * * While it may be true that this commercial agreement, made under authority of the tariff act of 1897, § 3, was not a treaty possessing the dignity of one requiring ratification by the Senate of the United States, it was an international compact, negotiated between the representatives of two sovereign nations, and made in the name and on behalf of the contracting countries, and dealing with important commercial relations between the two countries, and was proclaimed by the President. * * *"

In the above pronouncement, the Court clearly recognizes the existence of international agreements which do not require senatorial approval.

In Field v. Clark, supra [143 U.S. 649, 12 S.Ct. 505], the Supreme Court, in construing the reciprocal trade provisions of the Tariff Act of 1890, held:

"The court is of opinion that the third section of the act of October 1, 1890, is not liable to the objection that it transfers legislative and treaty-making power to the president. Even if it were, it would not, by any means, follow that other parts of the act, those which directly imposed duties upon articles imported, would be inoperative. But we need not in this connection enter upon the consideration of that question."

In the case of Louis Wolf & Co. v. United States, 107 F.2d 819, 27 C.C.P.A., Customs, 188, C.A.D. 84, the United States Court of Customs and Patent Appeals had before it certain issues requiring the construction of treaties with Norway and Austria, as well as an agreement designated "commercial convention" between the United States and Cuba. In its opinion, the court stated, 107 F.2d at page 826, 27 C.C.P.A., Customs, at page 198:

" * * * We think that by the use of the term 'commercial convention' such a trade agreement as the Cuban Trade Agreement of 1934 was intended to be included, and it is our opinion that that agreement is a commercial convention although it was not ratified by the Senate. It is true that the treaties with Norway and Austria refer to the Cuban treaty of 1902 as a 'Commercial Convention' and that it was ratified by the Senate. The treaty of 1902 refers to itself as a 'convention.' We think it well settled that the term 'commercial convention' is broad enough not only to include commercial conventions which are ratified by the Senate when negotiated by the executive department of the Government, but that it also includes certain commercial agreements which may be authorized by Congress, if such conventions are within the powers so delegated.

"On this phase of the case we think it proper to say that the President, pursuant to acts of Congress, frequently has entered into agreements with foreign states. For instance, he has concluded engagements concerning commerce and navigation, and in the form of reciprocal arrangements for the suspension of duties in return for equitable concessions. See Crandall, 'Treaties (etc.),' 2nd edition, paragraph 62. See also Proclamation of President Theodore Roosevelt, December 5, 1907, announcing the conclusion of a commercial agreement with Great Britain under the tariff act of 1897, Malloy 'Treaties, (etc.),' Vol. I, page 812.

"The President is deemed to be the agent of the legislative department of the Government to ascertain and declare the event upon which its expressed will is to take effect."

See also Marianao Sugar Trading Corporation v. United States, 29 Cust.Ct. 275, 283–286, C.D. 1481.

In the Louis Wolf case, supra, the court cited the case of B. Altman & Co. v. United States, supra, to illustrate the difference between a treaty and an executive agreement. The court also cited with approval the following language from the case of United States v. Belmont, 301 U.S. 324, 330, 57 S.Ct. 758, 761, 81 L.Ed. 1134:

" 'A treaty signifies "a compact made between two or more independent nations, with a view to the public welfare." B. Altman & Co. v. United States, 224 U.S. 583, 600, 32 S.Ct. 593, 596, 56 L.Ed. 894. But an international compact, as this was, is not always a treaty which requires the participation of the Senate. There are many such compacts, of which a protocol, a modus vivendi, a postal convention, and agreements like that now under consideration are illustrations. See 5

Moore, Int. Law Digest, 210–221. The distinction was pointed out by this court in the Altman case, supra, which arose under section 3 of the Tariff Act of 1897 (30 Stat. 151, 203), authorizing the President to conclude commercial agreements with foreign countries in certain specified matters. * * *'

* * * * * *

"We think that an agreement such as the one at bar relating to customs duties which may be levied upon articles of commerce between the two countries (when the agreement is authorized by Congress, although not ratified by the Senate) may be properly styled a commercial convention. We therefore hold that appellants' contentions with reference to the effect of the treaties with Austria and Norway are without merit. See E. & J. Burke, Ltd. v. United States, 26 C.C.P.A., Customs, 374, 379, C.A.D. 44."

█ For the foregoing reasons, and in view of the holdings of the courts on the questions at issue, we are of opinion and hold that the Reciprocal Trade Agreements Act of 1934 does not violate the treaty clause of the Constitution of the United States (Article II, sec. 2), inasmuch as said agreement is not a treaty requiring concurrence by the United States Senate within the meaning of the term, as used in the Constitution. We further hold that said trade agreements act is not an unconstitutional delegation of legislative power (Article I, sec. 1, of the United States Constitution) such as would contravene the constitutional powers given to Congress under Article I, section 8, of the Constitution to lay and collect duties and to regulate commerce with foreign nations. Accordingly, we hold that the involved merchandise is properly dutiable as "Fish, prepared or preserved in any manner * * *" under paragraph 718(b) of the Tariff Act of 1930, as modified by the trade agreement with Iceland, T.D. 50956, at the rate of 12½ per centum ad valorem, as assessed. The protest is, therefore, overruled.

Judgment will be rendered accordingly.

MOLLISON, Judge.

I concur in the excellent majority opinion of my colleagues and the legal conclusions therein. In view of the importance of the subject matter, I feel impelled to state some of my own views.

Although the reciprocal trade agreements act has been on the statute books for 24 years and has been extended and amended and actively implemented, and although its constitutional validity has been challenged heretofore, the constitutionality of the act has not until now been the subject of direct adjudication and determination by a court having jurisdiction to decide such a question.[1]

Plaintiff contends that the Reciprocal Trade Agreements Act of 1934 (section 350(a) of the Tariff Act of 1930, 48 Stat. 943, 19 U.S.C.A. § 1351) is an unconstitutional and improper delegation to the President of power expressly reserved in the Constitution to the Congress; that there is no prescribed formula, factual or otherwise, to regulate the President's discretionary power and action in determining the taxing policy on imports into the United States; that, in providing for the administration of the trade agreements policy established by Congress, the Congress exceeded its

---

1. The constitutionality of the act was challenged in the case of Ernest E. Marks Co. v. United States, 117 F.2d 542, 28 C.C.P.A., Customs, 286, C.A.D. 156; affirming C.D. 305, 4 Cust.Ct. 126, which held that a party cannot contend that subsection (b) 19 U.S.C.A. § 1351 is unconstitutional and at the same time seek relief under subsection (a) since both sections are to be construed as a whole, and if one portion is unconstitutional, the other must fall with it. See also Wislar v. United States, 97 F.2d 152, 26 C.C.P.A., Customs, 138, C.A.D. 7, certiorari denied 305 U.S. 629, 59 S. Ct. 93, 83 L.Ed. 403, where it was likewise not necessary to decide the constitutional issue raised.

constitutional authority and conferred upon the President "unfettered discretion" of a kind similar to that contained in sections 9 and 3 of the National Industrial Recovery Act of 1933, and which statutory grants of discretionary power were held by the Supreme Court to be invalid and unconstitutional delegations of legislative power to the Executive in Panama Refining Co. v. Ryan, supra and A. L. A. Schechter Poultry Corp. v. United States, supra. Plaintiff argues that, in enacting the Reciprocal Trade Agreements Act of 1934, Congress followed the statutory pattern or plan of the National Industrial Recovery Act of 1933; that "its declaration of policy and its delegation to the President of 'unfettered discretion' is alike in each statute," and, as a consequence, the reciprocal trade agreements act contains an unconstitutional delegation of legislative power and authority to the Executive. Plaintiff's argument is based upon the authority of the Panama Refining Co. and Schechter Corp. decisions of the Supreme Court.

The attorneys for the United States contend that the Congress may delegate to the President the discretion to determine *when* certain action shall be taken, and within predetermined limits *what* action shall be taken, provided the statute in question furnishes to the President an "intelligible principle" to guide his action. They maintain that the trade agreements act here in question contains an intelligible principle guiding the President's discretion and that such statute complied with the constitutional standards existing at the time of the enactment of said statute.

It is further contended in behalf of the United States that the trade agreements act does not contain the defects and constitutional infirmities present in sections 9 and 3 of the National Industrial Recovery Act of 1933 (48 Stat. 200 and 196–197) struck down by the Supreme Court in the Panama and Schechter decisions. The defendant's attorneys further claim that the statutory plan, on which the reciprocal trade agreements act was based, embodied legislative elements, features, and plans of prior tariff legislation, enacted at various times during a period of 44 years, some of the enactments having been declared valid and upheld by the Supreme Court. And, further, that the reciprocal trade agreements act is constitutional by the standards set forth in decisions rendered by the Supreme Court subsequent to the Panama Refining and Schechter decisions.

Plaintiff asserts that the decision of the Supreme Court in the case of J. W. Hampton, Jr., & Company v. United States, supra, decided the very issue under consideration here and is directly in point. With this contention I do not agree since the facts of the instant case involving the President's power to negotiate trade agreements and those in the Hampton case involving the validity of flexible tariff provisions are different. The statute involved in the case at bar is a different subject matter than that in the Hampton case so that the decision of the Supreme Court in the Hampton case is not in itself controlling of the issue here. However, it is true that the principles of law relative to the delegation of legislative power to the Executive enunciated in the Hampton decision have a very important bearing upon the decision of this case. It is also true that the legislative expedient of enabling the President to adjust or change tariff duties to meet changing conditions—the flexible tariff provision in section 315— is a legislative feature or statutory element which was upheld in the Hampton decision.

Plaintiff, in its brief, states that the "standard involved in the Hampton case * * * was the equalization of cost of production of a foreign made article to a similar domestic made article." Plaintiff then states: "The statute was only to be invoked and the increase in duty permitted where the rates of duty provided for in the Tariff Act were not sufficient to equalize the cost of production between the foreign and the domestic article." This is an inaccurate in-

terpretation of section 315 of the Tariff Act of 1922 and an erroneous statement of the conditions or facts which were to exist at the time when the powers granted were to be exercised and the statute invoked.

The statute was to be invoked and the powers might be exercised under section 315 *whenever the President, upon investigation of the differences in costs of production of the domestic and like or similar foreign articles, finds that the duties fixed in the tariff act do not equalize the differences in the costs of production of articles grown or produced in the United States and of like or similar articles grown or produced in the foreign countries;* upon such a finding the President was empowered to ascertain said differences and determine and proclaim the changes in classification or increases or decreases in any rate of duty provided in the act shown by said ascertained differences in such costs of production necessary to equalize the same, but by not more than 50 per centum.

The standard or declaration of congressional policy in the flexible tariff provision in section 315 which was to be administered or executed by the President was not a declared direct equation composed of the cost or production of a domestic article on the one side and the cost of production of a like or similar foreign article on the other. The standard or policy declared *was the President's finding as a fact,* upon *investigation,* that the duties fixed in the act did not equalize the differences in the cost of production of the domestic article and of the like or similar foreign article.

The standard or declaration of congressional policy or plan set forth in the flexible tariff provisions *involved in the Hampton case* were far from the definite and precise standard, as claimed by the plaintiff's counsel, but, on the contrary, section 315 of the Tariff Act of 1922 gave to the President a fairly wide latitude of discretion, as indicated in the Supreme Court's opinion in the Hampton case. Plaintiff apparently believes that the

President's determination of the differences of cost of production involved no discretion or judgment. However, section 315(c), 42 Stat. 942–943, authorized the President "in so far as he finds it practicable" to take into consideration various conditions, facts, and factors. Far from supporting the claims of the plaintiff that there is no sufficiently precise standard or statutory plan for the guidance of Executive action contained in the Reciprocal Trade Agreements Act of 1934, the decision of the Supreme Court in J. W. Hampton, Jr., & Company v. United States, supra, with reference to the constitutionality or validity of delegation of legislative power to the Executive, supports as constitutional and valid a legislative standard or plan to be executed or administered by the President which seems no more definite or precise than that contained in the trade agreements act. Cf. United States v. George S. Bush & Co., 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259.

The plaintiff also relies upon the Supreme Court case of Field v. Clark, supra. In that case, certain commodities were placed on the free list, and it was provided in section 3 of the Tariff Act of October 1, 1890, 26 Stat. 612, that where a country producing any of the named articles imposed duties upon imports from the United States which the President deemed to be "reciprocally unequal and unreasonable," the President was empowered to suspend the duty-free treatment on such articles which were the product of that country. The above standard or congressional declaration of policy to be executed and administered by the President was held valid and constitutional in Field v. Clark, supra, and not open to the objection that it unconstitutionally transfers legislative power to the President.

Section 3 of the Tariff Act of October 1, 1890, authorized the President to enter into reciprocity trade agreements, within a narrowly defined area or scope, which when concluded would not require the approval of either the Senate or the

Congress.[2] As a sanction to put pressure on the several countries to enter into these reciprocal trade agreements, section 3 instructed the President to impose specified penalty duties on certain named articles (sugar, molasses, coffee, tea, and hides) on the free list of the United States tariff whenever the supplying country's treatment of imports from the United States was deemed "to be reciprocally unequal and unreasonable." Upon the authority of section 3, 10 reciprocal trade agreements were concluded with foreign countries and proclaimed by the President.[3]

Not only is the Supreme Court's decision in Field v. Clark adverse and contrary to plaintiff's claim that there is an improper and unconstitutional delegation of legislative power to the President in the Reciprocal Trade Agreements Act of 1934, but also the Executive action taken under section 3, held valid and constitutional, and the conclusion and proclaiming of 10 reciprocal trade agreements based thereon is a precedent and practice in support of the validity and constitutionality of the Reciprocal Trade Agreements Act of 1934.

In the reciprocal trade agreements act, the President was authorized to enter into trade agreements with foreign Governments when he found as a fact that "any existing duties or other import restrictions of the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States" and when the purposes of the act will be promoted thereby; the President was also authorized to modify by proclamation existing duties and other import restrictions as would be required or appropriate to carry out such trade agreement. The standard, statutory plan or declaration of congressional policy contained in the Reciprocal Trade Agreements Act of 1934 for Executive guidance and execution is just as precise, definite, or adequate as were the statutory plans involved in J. W. Hampton, Jr., & Co. v. United States, supra, and Field v. Clark, supra, relied upon by plaintiff.

The reciprocal trade agreements act prescribes specific purposes to be accomplished in accordance with an understandable statutory plan and policy for the guidance of the President. There are predetermined limitations upon the authority granted, and the act contains an intelligible standard or principle for the guidance of the President's discretion.

The Supreme Court has upheld many other statutes of the contingency type[4] where the President or some selected

---

2. U. S. Tariff Commission, Reciprocity and Commercial Treaties (1919), p. 149; U. S. Tariff Commission, Operation of the Trade Agreements Program, Part II (Rept. No. 160, 2d Series), p. 1.

3. Operation of the Trade Agreements Program, Part II (Rept. No. 160, 2d Series), p. 2.

4. For a history of some contingency type legislation see Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, at pages 308–309, 53 S.Ct. 350, at page 356, 77 L.Ed. 796: "The powers of the President under the flexible tariff provisions of the Act of 1922 differ in degree rather than in kind from powers that have long been his. By an act of March 3, 1815 (3 Stat. 224), the President was empowered to give effect to a repeal of duties upon imports whenever he was 'satisfied that the discriminating or countervailing duties' of the

foreign nation affected, 'so far as they operate to the disadvantage of the United States,' had been abolished. See Field v. Clark, 143 U.S. 649, 685, 12 S.Ct. 495, 36 L.Ed. 294. Powers very similar were conferred in later years. See, e. g., Act of March 3, 1817, c. 39, 3 Stat. 361; Act of January 7, 1824, c. 4, 4 Stat. 2, 3; Act of May 31, 1830, c. 219, 4 Stat. 425; Act of June 26, 1884, c. 121, 23 Stat. 57; Field v. Clark supra, at pages 686, 689, of 143 U.S., at pages 502, 503 of 12 S.Ct. 36 L.Ed. 294.[1] The Tariff Act of 1890 went farther than those before it. Whenever the President became satisfied that the government of any country producing and exporting certain enumerated articles had imposed duties upon the agricultural or other products of the United States which he found to be reciprocally unequal and unreasonable, he was to have power to suspend the provisions of the tariff law whereby importation of the enumerated articles had pre-

instrumentality has been authorized to do some act or take some action when the existence of a particular fact or condition was ascertained or determined.

In Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834, the Supreme Court, in upholding the wartime Emergency Price Control Act, 50 U.S. C.A.Appendix, § 901 et seq., said that Congress had stated the legislative objective—to stabilize prices and prevent inflation—and had prescribed the method of achieving that objective—maximum price fixing—and had laid down standards to guide the administrative determination of both the occasions for the exercise of the price-fixing power, and the particular prices to be established. It found the Emergency Price Control Act to be valid and not an improper delegation of legislative power to the price administrator. The Supreme Court relied upon J. W. Hampton, Jr., & Co. v. United States, supra, and Field v. Clark, supra, and other Supreme Court decisions, cited at page 424, of 321 U.S., at page 667 of 64 S.Ct. The Supreme Court found that the directions in the Emergency Price Control Act conferred "no greater reach for administrative determination than the power to fix just and reasonable rates"—

" * * * or the power to approve consolidations in the 'public interest,' sustained in New York Central Securities Corp. v. United States, 287 U.S. 12, 24–25, 53 S.Ct. 45, 48, 77 L.Ed. 138 (compare United States v. Lowden, 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208); or the power to regulate radio stations engaged in chain broadcasting 'as public interest, convenience or neces-

sity requires,' upheld in National Broadcasting Co. v. United States, supra, 319 U.S. 190, at pages 225–226, 63 S.Ct. 997, at pages 1013, 1014, 87 L.Ed. 1344; or the power to prohibit 'unfair methods of competition' not defined or forbidden by the common law, Federal Trade Commission v. R. F. Keppel & Bro., 291 U.S. 304, 54 S.Ct. 423, 426, 78 L.Ed. 814; or the direction that in allotting marketing quotas among states and producers due consideration be given to a variety of economic factors, sustained in Mulford v. Smith, supra, 307 U.S. [38], at pages 48–49, 59 S.Ct. [648] at page 652, 653, 83 L.Ed. 1092; or the similar direction that in adjusting tariffs to meet differences in costs of production the President 'take into consideration' 'in so far as he finds it practicable' a variety of economic matters, sustained in J. W. Hampton, Jr., & Co. v. United States, supra; * * *."

The Supreme Court further said, in the Yakus decision at page 426 of 321 U.S., at page 668 of 64 S.Ct., that the authority to fix prices under certain circumstances to prevent inflation was no broader than "the authority to suspend tariff provisions upon findings that the duties imposed by a foreign state are 'reciprocally unequal and unreasonable', held valid in Field v. Clark, supra."

It is now a commonly accepted principle of law that legislative power can be conferred upon the executive branch of the Government provided that the grant of authority is limited by prescribed standards. The discretion conferred must not be so wide and extensive

viously been free. 26 Stat. 567, 612, c. 1244. Broader still was the delegation of power under the Tariff Act of 1909, which set up a system of maximum and minimum rates with permission to the President to adopt the one set or the other. 36 Stat. 11, 82, c. 6. Under none of these statutes was executive action conditioned upon an inquiry and report by any officer or department. In the fulfilment of his duties, the President con-

sulted whatever sources of information appeared to be appropriate, and when satisfied as to the facts, made proclamation of his action." See also Field v. Clark, supra, 143 U.S. at pages 681–692, 12 S.Ct. at pages 500–504.

"1. For other instances see Comer, Legislative Functions of National Administrative Authorities, pp. 64, et seq."

that its limits cannot be discerned. There must exist an ascertainable legislative policy to which the exercise of the delegated power must conform. J. W. Hampton, Jr., & Co. v. United States, supra; Field v. Clark, supra; Yakus v. United States, supra, 321 U.S. at page 424, 64 S.Ct. at page 667; Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263; Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441; United States v. Rock Royal Co-op, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092; Lichter v. United States, 334 U.S. 742, 783, 785, 68 S.Ct. 1294, 92 L.Ed. 1694; Fahey v. Mallonee, 332 U.S. 245, 250, 67 S.Ct. 1552, 91 L.Ed. 2030.

The scope and extent of the discretion allowed the executive branch in delegated legislation is set forth in the Yakus decision of the Supreme Court, where it held:

"* * * These essentials [of the legislative function] are preserved when Congress has specified the basic conditions of fact upon whose existence or occurrence, ascertained from relevant data by a designated administrative agency, it directs that its statutory command shall be effective. It is no objection that the determination of facts and the inferences to be drawn from them in the light of the statutory standards and declaration of policy call for the exercise of judgment, and for the formulation of subsidiary administrative policy within the prescribed statutory framework. See Opp Cotton Mills v. Administrator, supra, 312 U.S. 126, at pages 145, 146, 61 S.Ct. [524], at pages 532, 533, 85 L.Ed. 624, and cases cited."

Although the Yakus decision upheld a wartime emergency act, the Court's opinion shows that the standards therein were sufficient and adequate for normal peacetime legislation. Another case showing the extent of permissible delegation of legislative power to the Exec-

utive is Lichter v. United States, supra. The law in question provided for the renegotiation of contracts made by the Government during the war and authorized administrative officers to recover profits which they determined to be "excessive." The term "excessive profits" was not defined by the act with any specificity, but the Supreme Court held that the term considered in the context of the statute was an adequate statement of legislative policy and, therefore, constitutional.

In the case at bar, there was no "unfettered discretion" and authority granted to the President by the Reciprocal Trade Agreements Act of 1934; the act did not give the President a "blank check" to make tax laws, as claimed by the plaintiff; the prescribed standards of the statute were adequate and sufficient to regulate the President's discretion, especially in view of the expressed limitations upon his action. There are directions in the statute which give specific form and content to the statutory policy when it is considered in the light of the expressed purposes of the act, the objectives sought to be accomplished, and the background of the statutory subject matter. The trade agreements act contains a declaration or policy informing the President when he might act and specifying the limits or the extent of his authority with respect to customs duties, i. e., that duties might not be altered by more than 50 per centum. The act further provided that products might not be transferred between the dutiable and free lists. It provided for the duration of trade agreements and made them subject to termination within specified time limits. There was no unwarranted, improper, or unconstitutional delegation of legislative power to the Executive in the Reciprocal Trade Agreements Act of 1934 under which the trade agreement with Iceland was negotiated.

I agree with my colleagues that the Panama Refining and the Schechter Poultry Corp. cases are inapplicable and furnish no precedents or legal authority which should be applied in the instant

case. In the Panama Refining decision, the Supreme Court stated that section 9(c) went beyond the limits of permissible delegation of legislative power to the executive branch. It held that there was an absence of sufficient and adequate congressional policy for the guidance of Presidential action. The Supreme Court summed up the matter at page 430 of the decision in 293 U.S., at page 252 of 55 S.Ct., in the following manner:

" * * * As to the transportation of oil production in excess of state permission, the Congress has declared no policy, has established no standard, has laid down no rule. There is no requirement, no definition of circumstances and conditions in which the transportation is to be allowed or prohibited."

The reasons for declaring section 3 of the National Industrial Recovery Act invalid in the Schechter Poultry Corp. case were stated by the Supreme Court in the Yakus decision at page 424 of 321 U.S., at page 667 of 64 S.Ct.:

" * * * It prescribed no method of attaining that end save by the establishment of codes of fair competition, the nature of whose permissible provisions was left undefined. It provided no standards to which those codes were to conform. The function of formulating the codes was delegated, not to a public official responsible to Congress or the Executive, but to private individuals engaged in the industries to be regulated."

At the time of the enactment of the National Industrial Recovery Act of June 16, 1933, such legislation was without precedent insofar as regulation of an entire industry was concerned. There was no background of similar legislation or prior Executive or legislative practice with respect to such legislation. On the other hand, the situation as regards the Reciprocal Trade Agreements Act of 1934 was entirely different. In such latter situation, there was a consider-able body of contingency legislation precedents involving the regulation of foreign trade and commerce; also much prior tariff legislation, some of which involved features, elements, and statutory plans similar to the statutory plan used in the reciprocal trade agreements act. Many of these tariff features, plans and legislative formulas in various statutes, as has been previously seen, had been declared valid and constitutional by the Supreme Court, and the Executive actions and practices under them sustained.

Various statutes dealing with the foreign trade and commerce of the United States have authorized the President to ascertain the existence of a particular fact or condition and to issue a proclamation to make effective the purposes of the act. Report No. 1000, 73d Congress, 2d Session, accompanying H.R. 8687, Reciprocal Trade Agreements Act of 1934, pages 7–9. On the authority of such contingency statutes, numerous arrangements and reciprocity agreements involving the suspension of tariff duties have been made with foreign countries and made operative by proclamation.[5]

Pursuant to section 4228 of the Revised Statutes, 46 U.S.C.A. § 141, executive agreements were entered into providing for reciprocal abolition of discriminating duties on imports; and these agreements were brought into force by proclamations issued by the Presidents. These agreements were not submitted to the Senate. Report No. 1000, supra, page 9. Section 3 of the Tariff Act of October 1, 1890 (McKinley Act), 26 Stat. 612, conferred upon the President authority to suspend by proclamation the free introduction of sugar, molasses, coffee, tea, and hides, when he is satisfied that any country producing such articles imposes duties or other exactions upon agricultural or other products of the United States, which he may deem to be reciprocally unequal or unreasonable.

5. Crandall, Treaties, Their Making and Enforcement, 2d ed., pp. 121–122.

Section 3 was used as a basis for the negotiation and conclusion of 10 reciprocal trade agreements which were proclaimed and made effective but not submitted to the Senate for ratification or to the Congress for any action or approval.[6]

Between January 31, 1891, and May 26, 1892, the 10 reciprocal trade agreements were negotiated, concluded, and made effective by proclamation. The constitutionality of section 3 of the Tariff Act of October 1, 1890, on the authority of which the 10 reciprocal trade agreements were concluded, was challenged in the case of Field v. Clark, supra, on the grounds that it delegated and transferred legislative *and treaty-making powers* to the President. The Supreme Court held that the act was not liable to the above-mentioned constitutional objections.[7] Field v. Clark, supra, 143 U.S. at pages 681, 694, 12 S.Ct. at pages 500, 505. The decision in Field v. Clark, supra, is a supporting authority for the view of Congress, when it enacted the Reciprocal Trade Agreements Act of 1934, that it had the authority to authorize and empower the President, under prescribed standards and upon specified limitations upon his discretion, to negotiate and conclude reciprocal trade agreements and to make them effective by proclamation. The effect of the decision in Field v. Clark, coming after 6 of the 10 reciprocal trade agreements had been concluded and made effective by proclamation,[8] was an approval of such trade agreements and the exercise of such Executive authority and practice.

Section 3 of the Tariff Act of July 24, 1897 (the Dingley Act), 30 Stat. 203–204, specifically provided for the negotiation and conclusion by the President of reciprocal trade agreements with countries producing certain enumerated articles, in which reciprocal and equivalent concessions in favor of products of the United States might be secured. On the authority of section 3 of the Tariff Act of July 24, 1897, the President concluded and made effective by proclamation at least nine reciprocal trade agreements. See Reciprocity and Commercial Treaties, supra, page 215. See also 17 C.J., page 543, Customs Duties, section 14, note 8; 25 C.J.S. Customs Duties § 18. These reciprocal trade agreements were concluded under the authority of section 3 of the Tariff Act of July 24, 1897, and were not submitted to the Senate but were brought into force by proclamation by the President. House Report No. 1000, supra, page 10. See also Senate Report No. 871, 73d Congress, 2d Session, accompanying H.R. 8687, Reciprocal Trade Agreements Act of 1934 (incorporating majority House report) page 13.

Full force and effect to various of these reciprocal trade agreements, concluded under section 3 of the Tariff Act of July 24, 1897, were given by decisions of the courts of the United States. Nicholas v. United States, C.C., 122 F. 892; United States v. Tartar Chemical Co., 2 Cir., 127 F. 944; United States v. Luyties, 2 Cir., 130 F. 333; United States v. Julius Wile Bro. & Co., 2 Cir., 130 F. 331; Migliavacca Wine Co. v. United States, C.C., 148 F. 142; La Manna, Azema & Farnan v. United States, 2 Cir., 144 F. 683; Mihalovitch, Fletcher & Co. v. United States, C.C., 160 F. 988; Shaw v. United States, 1 Ct.Cust.App. 426, T.D. 31500.

A reciprocal trade agreement authorized by section 3 of the Tariff Act of July 24, 1897, negotiated, concluded, and proclaimed under the authority of the President, was likewise given recogni-

---

6. U. S. Tariff Commission, Reciprocity and Commercial Treaties, page 149; U. S. Tariff Commission, Operation of the Trade Agreements Program, Report No. 160, 2d Series, Part II, pp. 1, 2.

7. See concurring opinion at page 697, of 143 U.S., at page 506 of 12 S.Ct. of Field v. Clark, supra, indicating that the issue of treaty-making power was involved in the decision of the case.

8. Crandall, op. cit., p. 122. Field v. Clark was decided by the Supreme Court February 29, 1892.

tion, force and effect in B. Altman & Co. v. United States, supra. It can hardly be doubted that the Congress has the authority, in regulating foreign trade and commerce, to authorize the President, under prescribed standards and limitations, to negotiate, conclude, and make effective by proclamation reciprocal trade agreements lowering customs duties in return for concessions granted the United States. Field v. Clark, supra; Buttfield v. Stranahan, 192 U.S. 470, 24 S.Ct. 349, 48 L.Ed. 525; Monongahela Bridge Co. v. United States, 216 U.S. 177, 30 S.Ct. 356, 54 L.Ed. 435; Greene Cattle Company, Inc., v. United States, 36 C.C.P.A., Customs, 52, C.A.D. 397; George E. Bardwil & Sons v. United States, 42 C.C.P.A., Customs, 118, C.A.D. 583.

In the drafting or passage of the Reciprocal Trade Agreements Act of 1934, the Congress might have provided, as it did in section 4 of the Tariff Act of July 24, 1897, for submission of the reciprocal trade agreements authorized thereunder to the Senate for its advice and consent. However, in drafting the Reciprocal Trade Agreements Act of 1934, it followed the legislative plan adopted in Section 3 of the Tariff Act of October 1, 1890, and section 3 of the Tariff Act of July 24, 1897; it deliberately chose not to provide for submission of the reciprocal trade agreements concluded by the President to the Senate for its advice and consent or to the Congress for its approval or action. See House Report No. 1000, 73d Congress, 2d Session, pages 5, 6, 15; Senate Report No. 871, supra, pages 8, 9, 18.

I concur in the conclusions of my colleagues that the Reciprocal Trade Agreements Act of 1934 is valid and does not grant legislative and treaty-making powers to the President in violation of the Constitution. I concur further in the holding that the merchandise is properly dutiable under paragraph 718(b), as modified by the trade agreement with Iceland, and that the protest should be overruled.